CITY OF SCOTTSBLUFF, APPELLEE, v. WESTERN PUBLIC SERVICE COMPANY, APPELLANT.

FILED MAY 22, 1934. No. 28973.

*Clarence A. Davis, Morrow & Morrow* and *Mothersead & York,* for appellant.

*Floyd E. Wright* and *William H. Wright, contra.*

Heard before GOSS, C. J., GOOD, EBERLY, DAY and PAINE, JJ., and TEWELL, District Judge.

PAINE, J.

This is an action at law, brought by the city of Scottsbluff to recover $1,841.94 with interest, being money paid at the

rate of $100 a month for 18 months and 13 days, beginning April 1, 1930, for a claim filed each month with the city for "operating city water pumps per month." The Western Public Service Company, defendant, counterclaimed and asked for a judgment for $100 a month for such service, beginning October 1, 1931, and ending March 1, 1933. Jury was waived, and after trial a judgment was entered, dismissing the petition of the city and dismissing counterclaim of the company.

On February 14, 1930, the city council of the city of Scottsbluff (hereinafter called the city) by ordinance granted a franchise to the Western Public Service Company (hereinafter called the company) for a period of 25 years to operate and maintain its electric light system. Section 5 of the franchise provided that the company would furnish, and the city agreed to purchase, receive, and pay for, its requirements for street lighting, water pumping, and sewer pumping services, on a certain basis therein set out. It was also provided in said ordinance that the company would install such pumping equipment as may be requested by the city in writing, and that the city would pay the company an annual fixed charge of 6 per cent. on the investment made by the company to cover interest, and pay 9 per cent. to cover taxes, maintenance, and replacement of the equipment, and the original amount of the pumping equipment so installed cost $5,000. Prior to the passage of the ordinance granting the franchise, the question was submitted to the electors of the city at a special election called for that purpose, and was duly authorized.

The franchise went into effect March 18, 1930, and, in pursuance of an oral agreement between the city council and the division superintendent of the company, it was agreed that the city would pay $100 a month to the company for operating the pumps, which charge was in addition to, and had nothing to do with, the cost of the electric current required to run the pumps as shown by the meters, but the $100 a month item covered the upkeep

of the pumps, the oil, fixing them up, keeping them in good repair, and running in a satisfactory manner. On April 1, 1930, the company billed the city for $41.94, covering the first period of 13 days under the new franchise, and thereafter each month made a charge of $100 for 18 months, and the said charge was duly audited by the finance committee, allowed by the city council, and warrants were drawn in payment thereof.

A change in the city administration then took place, and the council promptly stopped paying this item of $100 a month, claiming there was no authority to pay the same under the franchise. However, the company continued to bill the city for this amount each month, the said item of $100 being the part of a much larger bill covering cost of electricity and other items provided by the .franchise, and the city rejected this item from the bill before paying the same.

On September 5, 1932, the city filed a petition in the district court and sought to secure a judgment against the company for the $1,841.94 already paid, with interest at 7 per cent. On April 24, 1933, the company filed its answer, admitting that the city had made a written demand upon the company for a refund, which it had refused to honor, and denied any liability thereunder, and, in addition, set up a counterclaim for 18 months' additional service in operating said pumps at the rate of $100 a month, and asked judgment for $1,800.

The first question presented is whether section 5 of the franchise provides for such disputed payment of $100 a month for the operation of the pumps. The city claims that there is no such provision in the franchise, and, further, that the amounts already paid on such claim were paid out without authority, and should be refunded. The company, on the other hand, maintains that all the company was required to do was to set up the pumps and furnish the electric energy to operate all of such pumps, and that, if the city was required to pay the expense of the electric energy for running the pumps, it would also be

required to pay an additional amount for the upkeep, for oiling the pumps, and fixing them up, and keeping them each going properly, and claims that it is evident that there is nothing in the franchise that requires the company to furnish a man to do such labor on the pumps.

The company contends that in 1910 Scottsbluff had a population of 3,500, and at the time the franchise was entered into it had a population of 8,500, and if such rapid growth continued there would during the life of the contract, of 25 years, be a necessity of installing a dozen or two dozen additional pumps, and that nothing in the franchise requires this manual labor in and about each pump to be done and performed by the company.

In the counterclaim the company alleges that there was an oral contract for this $100 a month, which was a contract the city was duly authorized to enter into, but also in the counterclaim it sets up that the charge of $100 a month was a fair and reasonable charge for the services performed, which services the city accepted, allowed, and paid for, thus basing their claim, not alone on contract, but on *quantum meruit*. The franchise provides that all of these pumps shall be purchased and installed by the company, and it is claimed by the city that each and all of these pumps were duly installed upon land belonging to the company, and that the city would have no right to send one of its employees upon the land of the company to work in and about and around these pumps.

It is claimed on the part of the company that the city, in operating its waterworks and sewer system, is doing this the same as any other individual, and not in its governmental capacity as a city, and that for such business so conducted the law does not require the contract to be submitted to a vote of the people.

It is difficult, in a careful reading of the franchise, to find any specific clause which provides, even indirectly, that the city must furnish a man to handle these pumps, but it does provide that they shall be installed by the company, and the company shall furnish the electric energy

to run them, which would, in a way, negative the idea that the city had any duty to perform in the operating of the pumps.

The members of the city council, in office at the time this franchise went into effect, decided to pay this fee of $100 a month.

"A practical construction placed upon an ambiguous contract by the parties will generally be adopted by the courts." *Hale v. Sheehan,* 52 Neb. 184; *Wilhoit v. Stevenson,* 96 Neb. 751. See, also, *Sibert v. Hostick,* 91 Neb. 255; *Jobst v. Hayden Bros.,* 84 Neb. 735.

It has been held that such a construction by the parties will be enforced, even though it be a peculiar construction. *Woodard v. Baird,* 43 Neb. 310. It was said in 4 Neb. Law Bulletin, 149: "Such applications of the rule may be justified perhaps upon the theory that the conduct of the parties amounts to an implied agreement modifying the contract."

"Where the proper construction of a contract is not free from doubt, recourse may be had to the preliminary negotiations between the parties for the purpose of determining the correct construction to be given it." *Mather v. London Guarantee & Accident Co.,* 125 Minn. 186.

"To reconcile seeming inconsistencies in provisions of a written contract, when segregated from the context, the instrument should be considered in all of its parts, and mutual interpretation of the parties as indicated by what they did under it, as well as fair dealing and intention, if discernible from the writings as a whole, may be also considered." *Petersen v. City of Omaha,* 120 Neb. 219.

The action of the city in paying the $100 a month is binding upon the city in the case at bar, for it was on a claim regularly presented, duly audited by the finance committee, and warrants ordered drawn by the council, and this court can find nothing illegal in such voluntary payments, and having been made, such payments cannot be recovered by the city.

These payments of $100 a month, which we have been

discussing, covered payments already made, many months before, and it might well be said that the water has gone over the dam, and this city council is estopped from recovering payments thus willingly made by a former city council.

However, this court finds no precedents for holding that, because a former city council saw fit to make these payments, the city is therefore bound to continue to make them until the termination of the 25-year franchise, for we cannot find that such payments are definitely specified therein. Having carefully examined the entire record and briefs, we find no reversible error therein, and the judgment of the district court is, therefore,

AFFIRMED.